Andrew L. Deutsch (AD 5782)
Monica Petraglia McCabe (MM 5853)
Christine M. Jaskiewicz (CJ 1477)
DLA PIPER US LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
Attorneys for Plaintiffs

07 CV 6261

JUL 0 6 2007

U.S.D.C S.D N.Y
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
ROTHSCHILDS CONTINUATION HOLDINGS
AG, ROTHSCHILD NORTH AMERICA INC.,
ROTHSCHILD INC., and ROTHSCHILD
ASSET MANAGEMENT INC.,

                            Plaintiffs ,

         - v. -

JED P. KAPLAN, KAPLAN & CO.
SECURITIES LLC, and LF ROTHSCHILD,
LLC,

                         Defendants.

------------------------------------------------------------- x

07 Civ. _____

**COMPLAINT**

     Plaintiffs, Rothschilds Continuation Holdings AG, Rothschild North America Inc.,

Rothschild Inc, and Rothschild Asset Management Inc. (collectively, the "**Rothschild Parties**"

or "**plaintiffs**"), by their attorneys, DLA Piper US LLP, for their complaint against defendants,

Jed P. Kaplan, Kaplan & Co. Securities, LLC, and LF Rothschild, LLC (collectively, the

"**Kaplan Defendants**"), allege as follows:

<u>**Introduction**</u>

    1.    This is a civil action for false descriptions and false designations of origin in

violation of 15 U.S.C. § 1125(a), for an order enjoining Jed P. Kaplan ("**Kaplan**") from

continuing to pursue federal registration of the mark L.F. ROTHSCHILD & COMPANY under

15 U.S.C. § 1116(a), and for dilution and unfair competition under the common and statutory

law of the State of New York. The action seeks an injunction against the Kaplan Defendants'

further use of the marks L.F. ROTHSCHILD & COMPANY, LF ROTHSCHILD, or any other

mark containing the name "Rothschild" ("**Infringing Marks**").

2.      The Rothschild Parties are businesses owned and controlled by members of the

world-renowned Rothschild Family, which has used the name "Rothschild" in connection with

financial services for well over two centuries. In the United States, the Rothschild Parties

currently use the marks ROTHSCHILD, ROTHSCHILD INC., ROTHSCHILD NORTH

AMERICA, and ROTHSCHILD ASSET MANAGEMENT in connection with a wide range of

financial services. As a result of the historical and current prominence of the Rothschild Family

and their businesses in banking and finance, the name "Rothschild," when used in connection

with a banking or financial business, conjures up associations with the Rothschild Parties in the

mind of the relevant public.

3.      Upon information and belief, Kaplan is an individual who is the chief executive

officer of and controls a registered broker-dealer and registered investment advisor business that,

until recent months, was known as Kaplan & Co. Securities, LLC ("**Kaplan & Co.**"), and which

operated offices in New York and Florida.

4.      The United States Securities and Exchange Commission ("**SEC**") issued orders

determining that two registered representatives of Kaplan & Co. engaged in a fraudulent market

timing and late trading scheme that violated federal securities laws and regulations. These

employees also pled guilty to violations of New York criminal law. The SEC thereafter found

that Kaplan & Co. and Kaplan failed to properly supervise these employees, failed to adequately

investigate evidence of the employees' frauds, failed to properly maintain records (and in

Kaplan's case, aided and abetted the failure), and that Kaplan personally profited from this fraudulent activity. As a result, the SEC issued cease-and-desist orders against and censured Kaplan & Co. and Kaplan, required Kaplan & Co. and Kaplan to jointly pay $50,000 in disgorgement and interest, imposed a penalty of $50,000 on each of Kaplan & Co. and Kaplan, and suspended Kaplan from association in a supervisory capacity with any broker, dealer, or investment adviser for nine months. The SEC's order, and the censure, disgorgement and penalties imposed on Kaplan & Co. and Kaplan were widely reported in the public and financial press.

5.      Upon information and belief, Kaplan and Kaplan & Co. knew that the publicity given to their employees' violations of securities laws and regulations had and would continue to have a highly negative effect on the reputation of Kaplan & Co. Moreover, upon information and belief, after the SEC acted against the Kaplan & Co. employees, Kaplan and Kaplan & Co. expected that the SEC would soon determine that Kaplan and Kaplan & Co. had likewise violated securities laws and regulations and would impose sanctions on them, which would also receive broad publicity, and further damage the reputation of Kaplan & Co. Upon information and belief, to avoid this consequence, Kaplan and Kaplan & Co. embarked on a willful and deceptive scheme to disguise the identity and bad reputation of Kaplan & Co. from the public, and to misappropriate the goodwill and high reputation attaching to the name "Rothschild" by adopting names and marks that would suggest a connection or affiliation between the Kaplan & Co. business and plaintiffs.

6.      In furtherance of this scheme, (a) Kaplan applied to the United States Patent and Trademark Office ("**PTO**") to register the mark L.F. ROTHSCHILD & COMPANY for use by Kaplan & Co., (b) Kaplan applied to the Florida Secretary of State's office to change the registered name of the broker-dealer and investment advisor entity from "Kaplan & Co

Securities, LLC" to "LF Rothschild, LLC," (c) the Kaplan Defendants abandoned use of the

mark KAPLAN & CO. SECURITIES and adopted use of the marks L.F. ROTHSCHILD &

COMPANY and LF ROTHSCHILD, including use of the latter mark in a graphic form that was

deceptively close to the graphic form used by plaintiffs for their own marks and (d) the Kaplan

Defendants registered the domain name www.lfrothschild.com and began to operate a website at

that web address using the marks L.F. ROTHSCHILD & COMPANY and LF ROTHSCHILD

("**Website**").

   7. As shown below, plaintiffs have been and, unless the Kaplan Defendants are

enjoined, will continue to be gravely and irreparably damaged by the Kaplan Defendants' use

and possible registration of the Infringing Marks.

**Parties**

   8. Plaintiff Rothschilds Continuation Holdings AG ("**RCH**") is a joint stock

company organized under the laws of Switzerland, located and doing business at Baarerstrasse

95, Zug 6301, Switzerland.

   9. Plaintiff Rothschild North America Inc. ("**RNA**") is a corporation organized

under the laws of Delaware, located and doing business at 1251 Avenue of the Americas, New

York, New York 10020-1104.

   10. Plaintiff Rothschild Inc. ("**RINC**") is a corporation organized under the laws of

Delaware, located and doing business at 1251 Avenue of the Americas, New York, New York

10020-1104.

   11. Plaintiff Rothschild Asset Management Inc. ("**RAM**") is a corporation organized

under the laws of New York, located and doing business at 1251 Avenue of the Americas, New

York, New York 10020-1104.

12.     Upon information and belief, Kaplan is an individual residing at 17729 Middlebrook Way, Boca Raton, Florida 33496.

13.     Upon information and belief, Kaplan & Co. is or was a limited liability company organized under the laws of Florida with its principal place of business located at 150 East Palmetto Park Road, Suite 450, Boca Raton, Florida 33432. Upon information and belief, Kaplan & Co. was formed by conversion from the corporate entity Kaplan & Co. Securities, Inc, as shown by a filing made on or about November 27, 2006 with the Florida Secretary of State (Exhibit 1). Upon information and belief, at relevant times, Kaplan & Co. has also maintained an office (but not a principal place of business) for the transaction of business within the City and County of New York, New York.

14.     Upon information and belief, LF Rothschild, LLC ("**LF Rothschild**"), is the same entity as Kaplan & Co and is a limited liability company organized under the laws of the state of Florida. Upon information, the name of this entity was changed to LF Rothschild, LLC by a filing made by Kaplan with the Florida Secretary of State, on or about January 3, 2007 (Exhibit 2).

### Jurisdiction and Venue

15.     Upon information and belief, Kaplan & Co. and LF Rothschild are subject to personal jurisdiction in New York pursuant to N.Y. C.P.L.R. § 302(a) in that they have, within relevant times, (a) used real property within New York for the transaction of business, (b) transacted business within New York by soliciting and accepting business from New York residents, and (c) used the Infringing Marks within New York by means of advertisements that have circulated in New York and operation of the Website, which solicits residents of New York to open accounts with LF Rothschild, and through which residents of New York may access

securities accounts, obtain information about their accounts, download account forms, and otherwise conduct business with LF Rothschild.

16.     Upon information and belief, Kaplan is subject to personal jurisdiction in New York pursuant to N.Y. C.P.L.R. § 302(a) in that (a) Kaplan had and has knowledge of and extensive control over the transactions of Kaplan & Co. and LF Rothschild alleged in paragraph 15 hereof and (b) Kaplan claims to own the Infringing Marks, as evidenced by his application to register one variation thereof with the PTO, and has licensed, authorized, and directed Kaplan & Co. and LF Rothschild to use the Infringing Marks within New York as alleged herein.

17.     The Court has subject matter jurisdiction over the claims asserted in this complaint as follows:

(a)     over the First and Second Claims for Relief pursuant to (i) 15 U.S.C. § 1121(a), (ii) 28 U.S.C. § 1332(a)(3), in that this is an action between citizens of different States and RCH is a citizen or subject of a foreign state that is an additional party, and the matter in controversy herein exceeds the sum or value of $75,000 exclusive of interest and costs, and (ii) 28 U.S.C. §§ 1331 and 1338(a); and

(b)     over the Third and Fourth Claims for Relief pursuant to (i) 28 U.S.C. § 1338(b) and (ii) 28 U.S.C. § 1367.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) in that all of the Kaplan Defendants are subject to personal jurisdiction in this district and a substantial part of the events related to plaintiffs' claims occurred in New York.

### Facts Common To All Claims

19.     Plaintiffs are entities controlled by members of the famous Rothschild Family, who trace their common ancestry to Mayer Amschel Rothschild (1744-1812). Mayer Amschel Rothschild's five sons established themselves in five separate cities, Paris, London, Vienna,

Frankfurt and Naples. The dispersed branches of the Rothschild Family proved extraordinarily successful, and the Rothschild Family grew to great prominence and wealth. They achieved renown as one of the most important and successful banking families in the world. Rothschild ventures have financed Wellington's armies, the Gold Rush, the acquisition of the Suez Canal, the early development of railroads in the United States and England, the search for oil, and mining of base (ore) metals such as copper and nickel. Over two centuries, the Rothschild banking and financial businesses have adapted and evolved so that they are now involved in many aspects of financial services, including finance, privatization, securities, asset management, mergers and acquisitions, restructuring and reorganization, private placements, project finance, private equity and venture capital.

20.    Near the end of the 18th century, Nathan Mayer Rothschild, one of the sons of Mayer Amschel Rothschild, settled in England. After his death, in 1818, NM Rothschild & Sons, a partnership, was formed to carry on the family financial business in England trading under that name. In 1968, the business was incorporated as NM Rothschild & Sons Limited, and has traded under that name since 1970.

21.    Following the Panic of 1837 in the United States, which led to a five-year depression in the United States, an agent of the Rothschilds, August Belmont, settled in New York as the American representative of the Rothschild interests and conducted business on their behalf.

22.    The first solely United States financial business established by the Rothschild Family was Amsterdam Overseas Corporation, jointly controlled by the English and French branches of the Rothschild Family. The business grew and was reorganized as an investment bank under the name New Court Securities Corporation in 1967. The business continued to grow, and in 1982 was again reorganized under the name Rothschild Inc.

23.    In 1987, RNA became the holding company for the Rothschild Family's American banking/financial services operations, including Rothschild Inc.  In 2003, RCH increased its ownership of RNA's voting securities to 100%.

24.    In the United States, the operating businesses owned by RNA are RINC, an SEC-registered securities broker-dealer with its principal office in New York City and a branch in Washington, D.C., and RAM, an SEC-registered investment advisor which was incorporated in 1962.  RAM currently has in excess of $5.4 billion of assets under management for institutions, investors such as corporate, public, and Taft-Hartley pension funds, endowments, and foundations.  It also provides discretionary investment advice to more than 870 retail/high net worth accounts under "wrap" programs sponsored by various institutions.

25.    As a result of the activities of plaintiffs and their predecessor entities, the Rothschild name has become extremely well known in the United States and throughout the world in connection with providing investment banking and financial advisory services.  The *Encyclopedia Britannica*, for example, states that ROTHSCHILD is "the name of a great European Jewish banking family."  19 *Encyclopedia Britannica* at 645 (William Benton, 1976).

26.    Numerous published works refer to the Rothschild Family, its businesses and influence.  For example, in *The Rothschilds:  A Family Portrait*, by Frederic Morton (New York: Atheneum, 1962), which has been dubbed an "epic bestseller," the first sentence reads, "For the last 150 years the history of the House of Rothschild has been to an amazing extent the backstage history of Western Europe."  *See also* The *World's Bankers: The History of the House of Rothschild* (New York: Penguin, 1999) ("All banks have histories . . . only the Rothschilds, however, have a mythology.  Most readers will recognize [the name], if only for its still fairly regular appearances in the press.")

27.    Well-known publications such as *Time* magazine frequently refer to the Rothschilds and their importance to the world of finance. In a September 29, 1980, article entitled "Family Feud," *Time* wrote: "The House of Rothschild, which once helped British Prime Minister Benjamin Disraeli buy the Suez Canal, needs no identification." Dozens of other widely distributed U.S. and international publications such as the *New York Times*, the *Washington Post*, *San Francisco Chronicle*, the *International Herald Tribune*, the *Jerusalem Post*, *Daily Mail (London)* and news services such as the Associated Press have frequently referred to the Rothschild Family and its financial businesses.

28.    For example, on March 9, 2007, the *New York Times* published on the first page of its business section a laudatory profile of Nathaniel Rothschild, a present-day member of the English branch of the Rothschild Family, who is a financier and who is next in line to become Lord Rothschild in England, which referred to the Rothschilds as "Europe's most storied banking family." Most recently, on June 14, 2007, the *New York Times* published a very substantial obituary of Baron Guy de Rothschild which described his extraordinary life and the impact of the Rothschild Family on international banking.

29.    As a consequence of plaintiffs' and their predecessors' activities, an unparalleled reputation and extraordinary goodwill has attached to the Rothschild name. The Rothschild name has thereby acquired distinctiveness and secondary meaning in connection with the provision of financial services and has come to be associated with the banks, investment houses, and other financial institutions controlled by the Rothschild Family. In the United States, this meaning, reputation, secondary meaning and goodwill has attached in particular to the financial services businesses operated by plaintiffs and the marks used by them in connection with those businesses.

## Plaintiff RCH

30.    Plaintiff RCH, a Swiss joint stock company, was established in 1982 by members of the Rothschild Family to ensure the continuation of the Rothschild Family financial services activities. It holds a 100% direct or indirect interest in the other plaintiffs. RCH owns all ROTHSCHILD-inclusive marks used by the other plaintiffs and permits them to use those marks.

## Plaintiff RNA

31.    Plaintiff RNA is the holding company for RINC, an SEC-registered securities broker-dealer, a member of the National Association of Securities Dealers ("**NASD**"), and an investment bank in the United States; RAM, an SEC-registered investment advisor; and other Rothschild businesses in the United States. RNA owns 100% of each of these businesses. For years prior to the Kaplan Defendants' first use of the Infringing Marks, and continuing to the present date, RNA has adopted and used the service marks ROTHSCHILD and ROTHSCHILD NORTH AMERICA in connection with the advertising, promotion, provision and sale of the aforesaid financial services in interstate commerce in the United States.

## Plaintiff RINC

32.    RINC provides financial advisory, investment banking and private equity services, including acting as private placement agent, dealer manager in tender and securities exchange offers, providing fairness opinions, and advising on restructuring both in the United States and together with other members of Rothschild-owned entities worldwide. It has offices in New York and Washington. It is a leader in global mergers and acquisitions ("**M&A**"), specializing in advising and structuring large and complex M&A transactions, as well as in restructuring companies in and out of bankruptcy.

- 10 -

33.    Among other recent transactions, RINC provided and continues to provide services on the (a) $3.4 billion acquisition by RITE AID of Jean Coutu Group; USA (b) $5.4 billion disposal of Westinghouse to Toshiba Corporation; (c) $1.4 billion acquisition of ID Biomedical Corporation by GlaxoSmithKline plc.; (d) $3.1 billion acquisition by Kinross Gold Corporation of Bema Gold; and (e) $2.8 billion exchange transaction between Henkel Group and the Clorox Company.

34.    RINC is also an active bankruptcy and restructuring advisor with significant experience working with companies in a variety of industries and representing a diverse group of debtors, bondholders, creditors' committees, single creditor classes and secured creditors. Among other projects, RINC has provided advice on the (a) ongoing restructuring of Delphi Corporation, a major automotive parts supplier; and (b) $28 billion restructuring of United Airlines.

35.    RINC also executes private placement offerings for clients of other Rothschild-owned entities.

36.    RINC's project finance group has advised, structured and executed more than $10 billion worth of limited recourse debt and equity project financings in the last decade. Project financings on which RINC is currently providing advice on include (a) the $600 million project financing for Phelps Dodge and Freeport Copper and Gold, and (b) the $1 billion debt financing for Dynetec and Sumitomo Corporation. Its project finance industry expertise spans several sectors, including metals and mining, utilities and power, oil and gas, transportation and other infrastructure, forest products, and water and waste treatment, and covers over 20 different countries. Indeed, RNA has been ranked as one of the leading project finance advisors by *Project Finance* magazine, including Number 1 in mining (1998, 1999 and 2000) and in Latin America (1999).

37.     For years prior to the Kaplan Defendants' first use of the Infringing Marks, and continuing through the present date, RINC has adopted and used the service marks ROTHSCHILD and ROTHSCHILD INC. in connection with the advertising, promotion, provision and sale of the aforesaid financial services in interstate commerce in the United States.

38.     RINC and its subsidiaries have used these service marks extensively in the securities, investment banking and financial services industry in the United States.

### Plaintiff RAM

39.     Plaintiff RAM is a wholly owned subsidiary of RNA, and is engaged in providing investment advisory services throughout the United States.

40.     RAM is an SEC-registered investment advisor specializing in providing investment advice on a discretionary basis to institutional accounts such as pension funds (ERISA), endowments and foundations as well as commingled funds. The products offered to clients include small-cap, mid-cap and large-cap companies based on the Russell 2000 Index, the Russell 2500 Index, Russell Mid-Cap Value Index and the Large Cap Core Index. RAM's advisory clients also include high net worth individuals.

41.     RAM also manages in excess of $5.4 billion in investments for corporate retirement plans, for public retirement plans, for Taft-Hartley union plans and other union plans, for foundations and endowments, and for health-care institutions.

42.     For years prior to the Kaplan Defendants' first use of the Infringing Marks, and continuing through the present date, RAM has adopted and used the service marks ROTHSCHILD and ROTHSCHILD ASSET MANAGEMENT in connection with the advertising, promotion, provision and sale of the aforesaid services in interstate commerce in the United States.

43.    Through the expenditure of substantial time, money and effort over the years by plaintiffs, through marketing and promotional activity by plaintiffs, and through extensive news coverage of the activities of plaintiffs, the mark ROTHSCHILD, standing alone or in combination with other words and symbols (including ROTHSCHILD INC., ROTHSCHILD NORTH AMERICA, and ROTHSCHILD ASSET MANAGEMENT), has acquired substantial distinctiveness, goodwill and secondary meaning, and, when used in connection with financial services within the United States, has come to be associated with financial services having their origin or sponsorship exclusively with the Rothschild Parties.

44.    Prior to 1991, there was a prominent investment banking and broker-dealer business known as L.F. Rothschild & Company, Inc. (and, for a period of time, as L.F. Rothschild, Unterberg, Towbin).  Upon information and belief, a founder of this company was in fact surnamed Rothschild (although not a member of the Rothschild Family), so that name was legitimately used, this company had been in business for many years, and the company had used the mark L.F. ROTHSCHILD continuously since 1914.  Upon information and belief, while most investors and persons connected with the securities industry knew that there was no connection between the Rothschild Family and this company, some less sophisticated members of the public may have believed that such a connection existed.

45.    In or about January 1991, this company filed for bankruptcy under Chapter 11 of the federal Bankruptcy Code, in the U.S. Bankruptcy Court for the Southern District of New York.  The Rothschild Family recognized that if the assets of the bankrupt entity were sold, there was a risk that an unscrupulous person or entity would purchase the rights to the L.F. Rothschild name and exploit it in an attempt to mislead the public into suggesting that the business was connected with the Rothschild Family or one or more of the businesses controlled by the Rothschild Family.

46.    To prevent this risk of misuse of the mark, a Rothschild Family-controlled company, Arcan N.V. ("**Arcan**"), purchased all right, title and interest to the mark L.F. ROTHSCHILD from the debtor, L.F. Rothschild & Co. Inc., and its parent, L.F. Rothschild Holdings, Inc. ("**Holdings**"), pursuant to an Asset Purchase Agreement dated April 30, 1993. Arcan paid a considerable amount of money for these rights. L.F. Rothschild & Co. Inc. and Holdings assigned the mark L.F. ROTHSCHILD to Arcan by a Bill of Sale dated May 4, 1993.

47.    The L.F. ROTHSCHILD mark rights have since been assigned from Arcan to NC Investments N.V., another Rothschild Family-controlled company.

### Kaplan & Co. And Kaplan's Involvement In Market Timing And Late Trading Schemes That Violated Federal And State Law, And SEC Sanctions Imposed Upon Them

48.    Upon information and belief, Kaplan & Co. (now known as LF Rothschild) was registered with the SEC as a broker-dealer on September 15, 1995, and as an investment adviser on March 21, 2003. Upon information and belief, it solicits and does business with both institutional and individual clients. RINC is also a registered broker-dealer and NASD member. Upon information and belief, Kaplan & Co., as a registered investment adviser servicing institutions and individuals, competes with RAM, which is also a registered investment adviser servicing institutions and high net worth individuals.

49.    Upon information and belief, at relevant times, Kaplan & Co. has conducted operations at 150 East Palmetto Park Road, Boca Raton, FL 33432, and 10 East 40th Street, New York, NY 10016.

50.    Upon information and belief, Kaplan is, and has been since September 15, 1995, the chief executive officer and control person of Kaplan & Co.

51.    Upon information and belief, no one named "L.F. Rothschild" or "Rothschild" is or has been associated with any of the Kaplan Defendants at any relevant time.

52.     One of the most serious scandals in the securities business in recent years was the "late trading" and "market timing" schemes uncovered and prosecuted by Eliot Spitzer, the then-Attorney General of the State of New York, and by the SEC. "Late trading" refers to a scheme by which broker-dealers executed favored customers' mutual funds trades after 4:00 pm ET, when the stock markets close, which allowed customers to receive same-day net asset value (NAV) pricing on trades as though they were received before the close of the stock markets. Since many important news events and market changes are released or occur after the close of the stock markets, this allowed these customers to capitalize on these events and changes. Legally, any trades in mutual funds occurring after 4:00 p.m. ET must be executed at the following day's NAV.

53.     "Market timing," generally speaking, involves the rapid trading in and out of mutual funds in order to take advantage of potentially stale stock prices. Although most mutual funds calculate the per-share price of their assets at 4:00 pm ET, that price may not reflect the most up-to-date market information. Accordingly, mutual funds impose restrictions on shareholders who violate the fund's rules concerning excessive trading of shares. As a result of the Spitzer and SEC investigations, certain broker-dealers were found to have illegally aided certain customers to avoid these restrictions, and to continue to engage in market timing, by allowing them to establish multiple brokerage accounts, using multiple registered representative numbers, multiple branch codes as the originating branch of transactions, and by establishing multiple relationships with clearing firms.

54.     On January 11, 2005, the SEC entered an Order (Exhibit 3) against two employees of Kaplan & Co., Lawrence S. Powell and Delano N. Sta.Ana. The Order found that from 2000 through September 2003, while these individuals were heading the institutional mutual fund group of Kaplan & Co., they "engaged in a course of business that operated as a

fraud and deceit in connection with the market timing and late trading of mutual fund shares on behalf of institutional customers." The individuals were individually required to pay disgorgement of $255,000, and each to pay a civil penalty of $120,000, and were barred from further association with any broker, dealer, or investment adviser.

55.    In addition, on January 11, 2005, the same individuals pled guilty in New York State Supreme Court to a violation of the Martin Act, N.Y. General Bus. Law § 352-c(E), a Class E felony, punishable by a maximum term of one to four years imprisonment.

56.    The SEC issued a press release announcing the Order (Exhibit 4), and the New York Attorney General's Office issued a press release announcing the individuals' guilty pleas (Exhibit 5). News stories were printed in the general and financial press about the violations of the Kaplan & Co. employees and the penalties imposed upon them. The name of Kaplan & Co. was prominently featured in these stories. A representative sample of these stories are shown as Exhibit 6 hereto.

57.    On December 18, 2006, the SEC entered an Order against Kaplan and Kaplan & Co. This Order (Exhibit 7) determined that Kaplan & Co., in violation of the federal securities laws and regulations issued thereunder, failed reasonably to supervise Powell and Sta.Ana, failed to adopt policies and procedures to monitor market timing and late trading so as to prevent and detect their fraudulent conduct, and failed to have a system in place to implement the limited policies and procedures that did exist.

58.    The Order further determined that Kaplan, as Kaplan & Co.'s principal, in violation of the federal securities laws and regulations issued thereunder, failed to supervise Powell and Sta.Ana, delegated supervisory responsibility to Powell, but did not instruct him on how to fulfill those responsibilities or on compliance or supervisory procedures, failed to train him on how to detect or avoid trading abuses, and did not follow up on his delegation of these

responsibilities. The Order further determined that Kaplan did not develop adequate policies and procedures, and failed to develop existing policies and procedures to monitor the individual's activities. It further determined that he was aware of matters warranting inquiry, such as numerous mutual fund trading orders rejected by mutual funds and mutual fund trades entered after 4:00 p.m., and failed to follow up and investigate these "red flags." It also determined that Kaplan & Co. willfully failed to maintain adequate books and records, and that Kaplan himself willfully aided and abetted in this failure.

59.     The Order further determined that "Kaplan profited from Powell and Sta.Ana's fraudulent late trading and market timing."

60.     The Order imposed, among other sanctions, censure on both Kaplan & Co. and Kaplan, a nine-month suspension on Kaplan's association in a supervisory capacity with any broker, dealer, or investment adviser, an order directing Kaplan & Co. and Kaplan to make disgorgement and pay interest in the total amount of $50,000, a civil money penalty of $50,000 on Kaplan & Co., and a civil money penalty of $50,000 on Kaplan personally.

61.     On or about December 18, 2006, the SEC issued a news summary which summarized the substance of the Order (Exhibit 8). As a result, the news that both Kaplan & Co. and Kaplan had had disgorgement remedies and penalties imposed by the SEC, and that Kaplan had been suspended from supervisory association with securities firms, was widely reported in the general and financial press (Exhibit 9).

### Adoption By Defendants Of The Deceptive And Misleading
### L.F. ROTHSCHILD & COMPANY And LF ROTHSCHILD Marks

62.     Upon information and belief, as a result of the violations of law and regulations and imposition of sanctions described above, and the publicity given to those violations and

sanctions, the name "Kaplan & Company Securities" acquired a highly negative connotation in the eyes of the public when used in association with a broker-dealer or investment advisor firm.

63.     Upon information and belief, as early as 2005, Kaplan and Kaplan & Co. recognized that a highly negative connotation would become attached to the "Kaplan & Company Securities" name as a result of the SEC's January 11, 2005 Order finding of violations of securities laws and regulations by Powell and Sta.Ana, and Powell and Sta.Ana's guilty pleas to criminal violations of New York's Martin Act. Moreover, upon information and belief, Kaplan and Kaplan & Co. anticipated as early as 2005 that the SEC would also bring public administrative and cease-and-desist proceedings against Kaplan and Kaplan & Co., and that the SEC was likely to ultimately find that they had violated securities laws and regulations, and would impose sanctions on them. Upon information and belief, Kaplan and Kaplan & Co. recognized that these governmental actions would further increase the negative connotation that the public would ascribe to the "Kaplan & Company Securities" name.

64.     Upon information and belief, to avoid the disrepute generated by their own violations of securities laws and regulations and those of their employees, Kaplan and Kaplan & Co., starting in 2005 and continuing through the present date, have undertaken a deceptive scheme to (a) conceal the true identity and history of the Kaplan & Co. business from the public, and (b) to misappropriate the extraordinary reputation and goodwill attaching to plaintiffs' businesses and marks by falsely suggesting an association or connection between the Kaplan & Co. business and one or more of the plaintiffs. To this end, they have abandoned any use of the "Kaplan" or "Kaplan & Company Securities" names and marks, changed the name of the Kaplan & Co. business to "LF Rothschild, LLC," exclusively used the Infringing Marks to identify the financial services provided by that business, and applied to register L.F. ROTHSCHILD & COMPANY as a mark for financial services. They have undertaken these acts although no one

by the name "L.F. Rothschild," or even "Rothschild," is or has been associated with any Kaplan Defendant.

65.     Upon information and belief, to further this deceptive scheme, the Kaplan Defendants have done the following:

a.      On or about May 2, 2005, Kaplan filed an intent-to-use application with the PTO to register L.F. ROTHSCHILD & COMPANY for use in International Class 36 for financial services (Exhibit 10). Upon information and belief, this application was abandoned by Kaplan.

b.      On or about April 27, 2006, Kaplan filed an application with the PTO to register L.F. ROTHSCHILD in International Class 36 as a trademark for financial services (Exhibit 11). Upon information and belief, this application was abandoned by Kaplan.

c.      On or about May 4, 2006, Kaplan filed an application (No. 78/876,888) with the PTO to register L.F. ROTHSCHILD & COMPANY in International Class 36 as a trademark for "financial services, namely, financial management and brokerage of shares or stocks or other securities" (Exhibit 12). This application was published for opposition on or about January 9, 2007, and plaintiffs herein filed papers in opposition to registration of this mark on or about April 27, 2007. This Opposition Proceeding (Docket No. 91176966) is currently pending before the Trademark Trial and Appeal Board of the PTO.

d.      On or about January 3, 2007, Kaplan filed papers with the Florida Secretary of State changing the name of Kaplan & Company Securities, LLC, to LF Rothschild, LLC.

e.    On or about February 20, 2007, Kaplan registered the domain name www.lfrothschild.com (the domain name registry information is shown at Exhibit 13) and began operating the interactive Website at that domain name. Printouts of several pages of the Website are attached as Exhibit 14.

f.    Upon information and belief, the Kaplan Defendants have advertised their business as "L.F. Rothschild & Company" and "LF Rothschild" to the public.

66.    Plaintiffs have consistently demanded that Kaplan and Kaplan & Co. desist from registering or using the Infringing Marks. On or about July 21, 2005, plaintiffs' counsel sent Kaplan a letter, certified mail, return receipt requested, in reaction to the filing by Kaplan of the intent-to-use application described in paragraph 65(a) hereof (Exhibit 15). This letter stated that plaintiffs viewed the application, "and any proposed use of the L.F. ROTHSCHILD mark, as a clear attempt to deceive the public and unfairly trade on public recognition of the "Rothschild" name and mark, in violation of federal and state trademark law. The letter demanded that Kaplan "immediately cease and desist from any use of the name or mark L.F. ROTHSCHILD." Although the letter was addressed to Kaplan's home address as identified in his application to register the mark, it was ultimately returned to plaintiffs' counsel by the U.S. Postal Service with an "unclaimed" stamp affixed to the envelope (Exhibit 16).

67.    Plaintiffs became aware that Kaplan was again attempting to register the mark L.F. ROTHSCHILD & COMPANY, when that mark was published for opposition in January 2007. Plaintiffs again evidenced their opposition to any registration or use of the mark by the Kaplan Defendants by filing for an extension of time in which to oppose registration, and, in April 2007, commencing an opposition proceeding against registration of the mark.

68.    However, plaintiffs did not become aware that Kaplan and Kaplan & Co. had actually begun use of the Infringing Marks until approximately June 12, 2007, when employees

of plaintiffs first observed the Website and saw the use of the Infringing Marks made by the

Kaplan Defendants on the Website.

69.    Since 2002, the Rothschild Parties have used a graphic representation of the mark

ROTHSCHILD that consists of the name "ROTHSCHILD" in a capital letter font, to the

immediate left of which is the capital letter "R" in a different font, and to the left of which is an

additional "Five Arrows" graphic device.  This graphic mark now appears on the

www.rothschild.com website operated by the Rothschild Parties, on their letterheads, and in their

printed materials.  (Examples of these uses are reproduced at Exhibit 17).

70.    On the Kaplan Defendants' Website (and, upon information and belief, on

letterhead and on printed materials used by the Kaplan Defendants), the graphic representation of

the mark LF ROTHSCHILD appears in two parts:  the name "ROTHSCHILD" in a capital letter

font similar to that used by the Rothschild Parties in their graphic ROTHSCHILD mark, and the

letters "LF" in a square immediately to the left of the name "ROTHSCHILD" (Exhibit 18).  The

commercial impression of this mark is closely and deceptively similar to that of the

ROTHSCHILD mark used by the Rothschild Parties.  A comparison of the uses of these marks

by plaintiffs and Kaplan Defendants is attached as Exhibit 19.

71.    Upon information and belief, the Kaplan Defendants deliberately selected the L.F.

ROTHSCHILD & COMPANY and LF ROTHSCHILD marks, and designed the LF

ROTHSCHILD graphic mark, in order to trade upon the very significant reputation and goodwill

developed by plaintiffs in their own marks, and which is associated by the public with the

financial services provided by the Rothschild Parties.  Upon information and belief, Kaplan

sought thereby to confuse actual and potential consumers into the belief that the services

provided under the Infringing Marks originate with, are sponsored by, or are approved by the

Rothschild Parties, and to disguise the fact that the entity using the Infringing Marks is actually the former Kaplan & Co.

72.     The Infringing Marks, as used by the Kaplan Defendants in word and graphic form, are confusingly and deceptively similar to plaintiffs' marks, ROTHSCHILD, ROTHSCHILD NORTH AMERICA, ROTHSCHILD INC., and ROTHSCHILD ASSET MANAGEMENT, such that the use by the Kaplan Defendants of the Infringing Marks and registration of L.F. ROTHSCHILD & COMPANY by Kaplan is likely to create confusion, mistake and deception of participants in the financial services industry and the investing public. The likelihood of confusion between the plaintiffs' marks and the Infringing Marks is heightened as a result of the related nature of the services offered by plaintiffs and the Kaplan Defendants, the similar channels of trade used by plaintiffs and the Kaplan Defendants, the fact that Kaplan & Co./L.F. Rothschild and RINC are both broker-dealers registered with the SEC and are members of the NASD, the fact that Kaplan & Co./L.F. Rothschild and RAM are both investment advisors registered with the SEC and advise institutional and individual clients, and the deliberate selection by the Kaplan Defendants of a graphic version of the LF ROTHSCHILD mark that is very close in commercial impression to plaintiffs' own graphic ROTHSCHILD mark.

73.     In view of the significant goodwill, distinctiveness, reputation and secondary meaning attached to plaintiffs' trademarks, the use by the Kaplan Defendants of the Infringing Marks, and the registration of L.F. ROTHSCHILD & COMPANY by Kaplan is likely to create confusion, mistake and deception among consumers and will cause or tend to cause consumers to believe that the Kaplan Defendants' services originate with or are otherwise licensed, sponsored or authorized by plaintiffs.

74.    By reason of all of the foregoing, plaintiffs have been and, unless the Kaplan Defendants are enjoined, will continue to be gravely and irreparably damaged by the Kaplan Defendants' use and possible registration of the Infringing Marks.

75.    Through the investment by plaintiffs and other members of the Rothschild Family of substantial time, money and effort over the years through marketing and promotional activity in the United States, the historical and cultural prominence of the Rothschild Family, and as a result of the very high reputation of services emanating from plaintiffs under the above-described marks, plaintiffs' marks are highly distinctive.

76.    The association created by the similarity between the Infringing Marks, on the one hand, and plaintiffs' distinctive marks, on the other, is likely to impair the distinctiveness of plaintiffs' marks, and thus is likely to cause dilution by blurring.

77.    Given the disrepute that now attaches to the Kaplan Defendants through their own widely-publicized violations of securities law and regulations, the association created by the similarity between the Infringing Marks, on the one hand, and plaintiffs' marks, on the other hand, is likely to harm the reputation of plaintiffs' marks, and thus is likely to cause dilution by tarnishment.

### First Claim For Relief

### (Lanham Act Violation – False Designation and Representations)

78.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 77 of this complaint as though fully set forth herein.

79.    Defendants' adoption and use of the Infringing Marks in connection with financial services, as alleged above, constitutes the use of false designations of origin or false or misleading descriptions and representations of fact, which is likely to cause confusion or

mistake, or to deceive consumers, as to the affiliation, connection or association of the Kaplan Defendants with plaintiffs, or as to the origin, sponsorship, or approval of the Kaplan Defendants' goods and commercial activities by plaintiffs, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

80.     Upon information and belief, the Kaplan Defendants adopted and have used the Infringing Marks in connection with financial services with the willful intent of deceiving and misleading the public into believing (a) that the business using those marks is associated with the Rothschild Parties and therefore is deserving of trust and the public's business and (b) that the business using those marks has no association with Kaplan & Co.

81.     As a result of the Kaplan Defendants' wrongful and willful acts, as set forth above, the Rothschild Parties have suffered and will continue to suffer irreparable injury which is not capable of monetary determination.

82.     Plaintiffs have no adequate remedy at law.

### Second Claim For Relief

### (Lanham Act Violation – Injunction)

83.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 82 of this complaint as though fully set forth herein.

84.     Federal Trademark Application No. 78/876,788 for L.F. ROTHSCHILD & COMPANY, has been filed by Kaplan for a fraudulent and deceptive purpose, and the Kaplan Defendants intend to use said mark, if registered, in order to misrepresent the source or nature of the services on or in connection with which that mark is used.

85.     Plaintiffs are entitled to an order enjoining Kaplan, and all persons and entities acting in concert with him, from further efforts to register said mark, or any other mark

containing the name or word "Rothschild," pursuant to 15 U.S.C. §§ 1063 and 1116(a), and directing him to abandon Federal Trademark Application No. 78/876,788 with prejudice.

### Third Claim For Relief

### (Common-Law Unfair Competition And Trademark Infringement)

86.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 85 of this complaint as though fully set forth herein.

87.     The wrongful acts of the Kaplan Defendants, as set forth above, constitute unfair competition and common-law trademark infringement under the common law of the State of New York.

88.     As a result of the Kaplan Defendants' wrongful acts, as set forth above, the Rothschild Parties have suffered and will continue to suffer irreparable injury which is not capable of monetary determination.

89.     Plaintiffs have no adequate remedy at law.

### Fourth Claim For Relief

### (Injury To Business Reputation And Dilution –
### § 360(*l*), General Business Law Of New York)

90.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 89 of this complaint as though fully set forth herein.

91.     As a result of the Rothschild Parties' extensive and continuous use of their trademarks as described herein, and the strong nature of those marks, those marks became distinctive.

92.     Use by the Kaplan Defendants of the Infringing Marks was and is done willfully and with the intention to trade on plaintiffs' reputation and/or to cause dilution of plaintiffs' marks.

93.     As a result of the facts set forth above, the Kaplan Defendants' use of the Infringing Marks, unless enjoined by this Court, is likely to cause both dilution by tarnishment and dilution by blurring of plaintiffs' marks, to plaintiffs' irreparable injury.

94.     The Kaplan Defendants' wrongful acts, as set forth above, have caused a likelihood of injury to the Rothschild Parties' business reputation and have the likely effect of diluting the distinctive quality of plaintiffs' above-mentioned marks, entitling plaintiffs to injunctive relief against such acts pursuant to Section 360(*l*) of the General Business Law of New York.

95.     As a result of the Kaplan Defendants' wrongful acts, as set forth above, the Rothschild Parties have suffered and will continue to suffer irreparable injury which is not capable of monetary determination.

96.     Plaintiffs have no adequate remedy at law.

WHEREFORE, plaintiffs demand judgment:

I.      Ordering:

a.      that the Kaplan Defendants, their officers, directors, agents, servants, employees, representatives and affiliates and all persons, firms, corporations and other entities in active concert or participation with them, or any of them, be preliminarily and permanently enjoined and restrained from:

(i)     using directly or indirectly, in any manner whatsoever, the Infringing Marks or any other mark or domain name that includes the name or word "Rothschild" or any mark similar in nature thereto;

(ii)    doing any other act or thing calculated or likely to cause confusion or mistake in the trade or the minds of the public, or to deceive actual or potential purchasers into

believing that the Kaplan Defendants' services originate with any of the plaintiffs or are

approved, licensed, or otherwise authorized by any of the plaintiffs;

(iii)    engaging in any other activity that constitutes unfair competition

with respect to plaintiffs; and

(iv)    aiding, abetting or assisting any other person or entity in engaging

in or performing any activities stated in paragraphs (i) through (iii).

b.    That the Kaplan Defendants, within five (5) days after entry of judgment,

deliver up to counsel for plaintiffs for destruction, all documents, including, without limitation,

promotional and advertising materials, catalogs, displays, labels, packaging, letterheads and

printed materials, and containers bearing, displaying, or incorporating the Infringing Marks, or

any other mark which includes the name or word "Rothschild" or any mark similar in nature

thereto.

c.    That the Kaplan Defendants assign over to plaintiffs all right, title, and

interest in and to the registration of the domain name www.lfrothschild.com and of any other

domain name that includes the name "Rothschild."

d.    That each Kaplan Defendant be directed to file with this Court and to

serve upon plaintiffs within thirty (30) days of the service of this Court's injunction, a written

report signed by said defendant, under oath, setting forth in detail the manner in which said

defendant complied with the injunction.

e.    That the Kaplan Defendants be directed to change the name of their

business to one that does not contain the name "Rothschild" and is not otherwise deceptive and

misleading, and to make all necessary filings with the Secretary of State of Florida, SEC, NASD,

and any other relevant government or self-regulatory organization to effect such change of name.

    f.     That the Kaplan Defendants be directed to send to all their customers a notice approved by the Court, advising said customers of the change of the name of the business and stating that plaintiffs have been enjoined from offering any services under the marks ROTHSCHILD, L.F. ROTHSCHILD & COMPANY, LF ROTHSCHILD, or any other mark which includes the name or word "Rothschild" or any mark similar in nature thereto.

    g.     That the Kaplan Defendants be required to account to plaintiffs for any and all profits derived by them from their acts of trademark infringement, dilution, and unfair competition and that plaintiffs have and recover three times their damages sustained as the result of the Kaplan Defendants' wrongful acts, together with interest as allowed by law.

    h.     That plaintiffs be awarded the costs and disbursements of this action, including reasonable attorney fees.

    i.     That such other and further relief be granted as the Court may deem just and proper.

    II.     On plaintiffs' Fourth Claim for Relief, enjoining Kaplan, and all persons and entities acting in concert with him, from further efforts to register the mark L.F. ROTHSCHILD & COMPANY, or any other mark containing the name or word "Rothschild," pursuant to 15 U.S.C. §§ 1063 and 1116(a), and directing him to abandon Federal Trademark Application No. 78/876,788 with prejudice.

Dated:     New York, New York
           July 6, 2007

                              Respectfully submitted,

                              DLA PIPER US LLP

                              By: _____
                                 Andrew L. Deutsch (AD 5782)
                                 Monica Petraglia McCabe (MM 5853)
                                 Christine M. Jaskiewicz (CJ 1477)
                              1251 Avenue of the Americas, 38th Floor
                              New York, New York 10020
                              Telephone:  (212) 335-4500
                              Telecopier:  (212) 335-4501
                                Attorneys for Plaintiffs,
                                ROTHSCHILDS CONTINUATION
                                HOLDINGS AG, ROTHSCHILD NORTH
                                AMERICA INC., ROTHSCHILD INC., and
                                ROTHSCHILD ASSET MANAGEMENT INC.