Andrew L. Deutsch (AD 5782)
Monica Petraglia McCabe (MM 5853)
Christine M. Jaskiewicz (CJ 1477)
DLA PIPER US LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

ROTHSCHILDS CONTINUATION HOLDINGS
AG, ROTHSCHILD NORTH AMERICA INC.,
ROTHSCHILD INC., and ROTHSCHILD
ASSET MANAGEMENT INC.,

07 Civ. 6261 (AKH)

                    Plaintiffs,

**DECLARATION OF JOHN M. CARROLL IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND ORDER GRANTING EXPEDITED DISCOVERY**

- v. -

JED P. KAPLAN, KAPLAN & CO.
SECURITIES, LLC, and LF ROTHSCHILD,
LLC,

                    Defendants.

-------------------------------------------------------- x

JOHN CARROLL declares as follows:

1.    I am a Managing Director and General Counsel of plaintiff Rothschild Inc.  I

make this declaration in support of the motion of plaintiffs, Rothschilds Continuation Holdings

AG ("**RCH**"), Rothschild North America Inc. ("**RNA**"), Rothschild Inc. ("**RINC**"), and

Rothschild Asset Management Inc. ("**RAM**") (collectively the "**Rothschild Parties**" or

"**plaintiffs**"), for a preliminary injunction enjoining and restraining defendants, Jed P. Kaplan

("**Kaplan**"), Kaplan & Co. Securities, LLC ("**Kaplan & Co.**"), and LF Rothschild, LLC

("**LF Rothschild**") (collectively, "**Kaplan Defendants**"), during the pendency of this action,

from further use of the marks L.F. ROTHSCHILD & COMPANY, LF ROTHSCHILD or any other mark containing the name "Rothschild" ("**Infringing Marks**"), and enjoining Kaplan from pursuing a pending application seeking federal trademark registration of the mark L.F. ROTHSCHILD & COMPANY. In addition, plaintiffs seek an order permitting expedited discovery.

2.    I am fully familiar with the facts set forth in this declaration, either through personal knowledge or through review of the plaintiffs' books, records, and other documents.

**Nature Of This Action And Motion**

3.    This is an action for false description and false designation of origin in violation of 15 U.S.C. § 1125(a) and for dilution and unfair competition under the common and statutory law of the State of New York. It seeks preliminary and permanent injunctive relief, damages and attorney's fees.

4.    LF Rothschild, LLC (formerly known as Kaplan & Co. Securities, LLC), is a broker-dealer and investment advisor registered with the Securities and Exchange Commission ("**SEC**"). Kaplan is the chief executive officer and controlling person of Kaplan and LF Rothschild. RINC is also an SEC-regulated broker-dealer, and RAM is also an SEC-regulated investment advisor.

5.    The Kaplan Defendants have begun to use the trademarks L.F. ROTHSCHILD & COMPANY and LF ROTHSCHILD for their broker-dealer and investment advisor business, even though these marks are confusingly similar to the Rothschild Parties' own marks ROTHSCHILD, ROTHSCHILD INC., ROTHSCHILD NORTH AMERICA, and ROTHSCHILD ASSET MANAGEMENT. In addition, Kaplan has applied to register the mark L.F. ROTHSCHILD & COMPANY with the United States Patent and Trademark Office

- 2 -

("**PTO**"), and the Rothschild Parties seek an injunction against further prosecution of that application.

6.    As far as public records show, no one named "Rothschild," much less "L.F. Rothschild," is employed by the Kaplan Defendants. In addition, Kaplan and Kaplan & Co. were recently censured by the SEC and compelled to pay large penalties for their involvement in an illegal market timing and late trading scheme. In fact, Kaplan is still under an SEC suspension that bars him from any supervisory role in Kaplan & Co.

7.    Unless Kaplan and the other Kaplan Defendants are immediately enjoined from further use of any ROTHSCHILD mark pending trial, the Rothschild Parties, as explained below and in the accompanying memorandum of law, will suffer irreparable injury in the form of infringement, blurring, and tarnishment of their distinctive marks, and there will be a continuing risk of confusion of the public. In contrast, the Kaplan Defendants will suffer no significant hardship from a preliminary injunction. They will continue to be free to operate their business under any legitimate name and mark other than one that incorporates "Rothschild."

**The History Of The Rothschild Parties**

8.    The Rothschild Parties are businesses owned and controlled by members of the world-renowned Rothschild Family, which has used the name "Rothschild" in connection with banking and financial services for well over two centuries. Members of the Rothschild Family trace their common ancestry to Mayer Amschel Rothschild (1744-1812). Mayer Amschel Rothschild's five sons established themselves in five separate cities, Paris, London, Vienna, Frankfurt and Naples. The dispersed branches of the Rothschild Family proved extraordinarily successful, and the Rothschild Family grew to great prominence and wealth. They achieved renown as one of the most important and successful banking families in the world. Rothschild

- 3 -

ventures have financed Wellington's armies, the Gold Rush, the acquisition of the Suez Canal, the early development of railroads in the United States and England, the search for oil, and mining of base (ore) metals such as copper and nickel. Over two centuries, the Rothschild banking and financial businesses have adapted and evolved so that they are now involved in many aspects of financial services, including finance, privatization, securities, asset management, mergers and acquisitions, restructuring and reorganization, private placements, project finance, private equity and venture capital.

9.      Near the end of the 18th century, Nathan Mayer Rothschild, one of the sons of Mayer Amschel Rothschild, settled in England. After his death, in 1818, NM Rothschild & Sons, a partnership, was formed to carry on the family financial business in England trading under that name. In 1968, the business was incorporated as NM Rothschild & Sons Limited and has traded under that name since 1970.

10.      Following the Panic of 1837 in the United States, which led to a five-year depression in the United States, an agent of the Rothschilds, August Belmont, settled in New York as the American representative of the Rothschild interests and conducted business on their behalf.

11.      The first solely United States financial business established by the Rothschild Family was Amsterdam Overseas Corporation, jointly controlled by the English and French branches of the Rothschild Family. The business grew and was reorganized as an investment bank under the name New Court Securities Corporation in 1967. The business continued to grow, and in 1982 was again reorganized under the name Rothschild Inc.

- 4 -

12.    In 1987, RNA became the holding company for the Rothschild Family's American banking/financial services operations, including Rothschild Inc.  Since 2003, RCH has owned 100% of RNA's voting securities.

13.    In the United States, the operating businesses owned by RNA are RINC, a SEC-registered securities broker-dealer and member of the National Association of Securities Dealers ("**NASD**"), and RAM, an SEC-registered investment advisor which was incorporated in 1962. RAM currently has in excess of $5.4 billion of assets under management for institutions, corporations, pension funds, endowments, and foundations.  It also provides discretionary investment advice to more than 870 high-net-worth individual accounts under "wrap" programs sponsored by various institutions.

14.    As a result of the activities of plaintiffs and their predecessor entities, the Rothschild name, and marks that include ROTHSCHILD, have become extremely well known in the United States and throughout the world in connection with providing investment banking and financial advisory services.  The *Encyclopedia Britannica*, for example, states that ROTHSCHILD is "the name of a great European Jewish banking family." 19 *Encyclopedia Britannica* at 645 (William Benton, 1976).

15.    Numerous published works refer to the Rothschild Family and the fame and influence of its businesses.  For example, in *The Rothschilds:  A Family Portrait*, by Frederic Morton (New York:  Atheneum, 1962), which has been dubbed an "epic bestseller," the first sentence reads, "For the last 150 years the history of the House of Rothschild has been to an amazing extent the backstage history of Western Europe." *See also The World's Bankers:  The History of the House of Rothschild* (New York:  Penguin, 1999) ("All banks have histories . . .

- 5 -

only the Rothschilds, however, have a mythology. Most readers will recognize [the name], if only for its still fairly regular appearances in the press.")

16.     Well-known publications such as *Time* magazine frequently refer to the Rothschilds and their importance to the world of finance. In a September 29, 1980 article entitled "Family Feud," *Time* wrote: "The House of Rothschild, which once helped British Prime Minister Benjamin Disraeli buy the Suez Canal, needs no identification." Dozens of other widely distributed U.S. and international publications such as *The New York Times*, the *Washington Post, the San Francisco Chronicle*, the *International Herald Tribune*, the *Jerusalem Post*, and the *Daily Mail (London)*, and news services such as the Associated Press frequently refer to the Rothschild Family and their financial businesses.

17.     For example, on March 9, 2007, *The New York Times* published on the first page of its business section a laudatory profile of Nathaniel Rothschild, a present-day member of the English branch of the Rothschild Family, who is a financier and who is next in line to become Lord Rothschild in England. The article referred to the Rothschilds as "Europe's most storied banking family." Most recently, on June 14, 2007, *The New York Times* published a substantial obituary of Baron Guy de Rothschild which described his extraordinary life and the impact of the Rothschild Family on international banking.

18.     As a consequence of plaintiffs' and their predecessors' activities, an unparalleled reputation and extraordinary goodwill has attached to the Rothschild name and to the ROTHSCHILD-inclusive marks used by businesses controlled by the Rothschild Family. These marks have acquired secondary meaning in connection with the provision of financial services and have come to be associated in the public mind with the banks, investment houses, and other financial institutions controlled by the Rothschild Family. In the United States, this meaning,

- 6 -

reputation, secondary meaning and goodwill has attached in particular to the financial services businesses operated by plaintiffs and the marks used by them in connection with those businesses.

**Plaintiff RCH**

19.    Plaintiff RCH, a Swiss joint stock company, was established in 1982 by members of the Rothschild Family to ensure the continuation of the Rothschild Family banking activities. It holds a 100% direct or indirect interest in the other plaintiffs.  RCH owns all ROTHSCHILD-inclusive marks used by the other plaintiffs and permits them to use those marks.

**Plaintiff RNA**

20.    Plaintiff RNA is the holding company for (a) RINC, which is an SEC-registered securities broker-dealer, a NASD member and an investment bank in the United States; (b) RAM, an SEC-registered investment advisor; and (c) other Rothschild businesses in the United States.  RNA owns 100% of each of these businesses.  For years prior to the Kaplan Defendants' first use of the L.F. ROTHSCHILD & COMPANY and LF ROTHSCHILD marks, and continuing to the present date, RNA has adopted and used the service marks ROTHSCHILD and ROTHSCHILD NORTH AMERICA in connection with the advertising, promotion, provision and sale of the aforesaid financial services in interstate commerce in the United States.

**Plaintiff RINC**

21.    RINC provides financial advisory, investment banking and private equity services, including acting as private placement agent, dealer-manager in tender and securities exchange offers, providing fairness opinions, and advising on restructuring both in the United States and, together with other Rothschild-related entities, worldwide.  It has offices in New

York and Washington, D.C.  It is a leader in global mergers and acquisitions ("**M&A**"), specializing in advising and structuring large and complex M&A transactions, as well as in restructuring companies in and out of bankruptcy.

22.     Among other recent transactions, RINC provided and continues to provide services on the (a) $3.4 billion acquisition by RITE AID of Jean Coutu Group USA; (b) $5.4 billion disposal of Westinghouse to Toshiba Corporation; (c) $1.4 billion acquisition of ID Biomedical Corporation by GlaxoSmithKline plc; (d) $3.1 billion acquisition by Kinross Gold Corporation of Bema Gold; and (e) $2.8 billion exchange transaction between Henkel Group and the Clorox Company.

23.     RINC is also an active bankruptcy and restructuring advisor with significant experience working with companies in a variety of industries and representing a diverse group of debtors, bondholders, creditors' committees, single creditor classes and secured creditors. Among other projects, RINC has provided advice on the (a) ongoing restructuring of Delphi Corporation, a major automotive parts supplier and (b) $28 billion restructuring of United Airlines.

24.     RINC also executes private placement offerings for clients of various Rothschild entities.

25.     RINC's project finance group has advised, structured and executed more than $10 billion worth of limited recourse debt and equity project financings in the last decade.  Project financings on which RINC is currently providing advice on include (a) the $600 million project financing for Phelps Dodge and Freeport Copper and Gold, and (b) the $1 billion debt financing for Dynetec and Sumitomo Corporation.  Its project finance industry expertise spans several sectors, including metals and mining, utilities and power, oil and gas, transportation and other

- 8 -

infrastructure, forest products, and water and waste treatment, and covers over 20 different countries. Indeed, RINC has been ranked as one of the leading project finance advisors by *Project Finance* magazine, including Number 1 in mining (1998, 1999 and 2000) and in Latin America (1999).

26.     For years prior to defendants' first use of the Infringing Marks, and continuing through the present date, RINC and its subsidiaries have adopted and used the service marks ROTHSCHILD and ROTHSCHILD INC. in connection with the advertising, promotion, provision and sale of the aforesaid financial services in interstate commerce in the United States.

27.     RINC and its subsidiaries have used these service marks extensively in the securities, investment banking and financial services industry in the United States.

**Plaintiff RAM**

28.     Plaintiff RAM is a wholly owned subsidiary of RNA and is engaged in providing investment advisory services throughout the United States.

29.     RAM is an SEC-registered investment advisor specializing in providing investment advice on a discretionary basis to institutional accounts such as pension funds, endowments and foundations as well as commingled funds. The products offered to clients include securities of small-, mid-, and large-cap companies based on the Russell 2000 Index, the Russell 2500 Index, Russell Mid-Cap Value Index and the Large-Cap Core Index. RAM's advisory clients also include high net worth individuals.

30.     RAM also manages in excess of $5.4 billion in investments for clients such as corporate retirement plans, public retirement plans, Taft-Hartley union plans, foundations and endowments, and health-care institutions.

NEWY1\8122466.2 7/9/07

31.     For years prior to the Kaplan Defendants' first use of the Infringing Marks, and continuing through the present date, RAM has adopted and used the ROTHSCHILD and ROTHSCHILD ASSET MANAGEMENT service marks in connection with the advertising, promotion, provision and sale of the aforesaid services in interstate commerce in the United States.

32.     The Rothschild Parties have spent substantial time, money and effort over the years promoting their businesses under the marks ROTHSCHILD, ROTHSCHILD INC., ROTHSCHILD NORTH AMERICA and ROTHSCHILD ASSET MANAGEMENT. As a result, these marks have acquired substantial distinctiveness, goodwill and secondary meaning and, when used in connection with financial services within the United States, has come to be associated with financial services having their origin or sponsorship exclusively with the Rothschild Parties.

**The Rothschild Parties Have Acted To Protect Their ROTHSCHILD Marks Against Infringement**

33.     The Rothschild Parties have been legitimately concerned that, given the distinctiveness of their marks and the Rothschild name, unscrupulous persons would adopt marks using ROTHSCHILD in order to deceive the public into thinking that their businesses were connected with plaintiffs and the famous Rothschild Family. They have therefore monitored the market and acted promptly when they determined that financial services businesses were making improper use of ROTHSCHILD or seeking to register marks inclusive of ROTHSCHILD or similar terms.

34.     For example, the Rothschild Parties and N.M. Rothschild & Sons, Ltd. opposed the registration of the mark SMITH-ROTHCHILD FINANCIAL CO. with the PTO. This

- 10 -

opposition was eventually settled by an agreement that greatly limited the use of this mark by its proposed registrant and acknowledged the Rothschild Parties' superior rights. The Rothschild Parties also successfully demanded that a company called Rothschild Solomon Capital Management, LLC, cease all use of that name.

35.     One mark of particular concern to us has been the very one now adopted and used by the Kaplan Defendants: L.F. ROTHSCHILD. Prior to 1991, there was a prominent investment banking and broker-dealer business known as L.F. Rothschild & Company, Inc. (and, for a period of time, as L.F. Rothschild, Unterberg, Towbin). Upon information and belief, a founder of this company was in fact surnamed Rothschild (although not a member of the Rothschild Family), so that name was legitimately used, this company had been in business for many years, and the company had used the mark L.F. ROTHSCHILD continuously since 1914. Upon information and belief, while most investors and persons connected with the securities industry knew that there was no connection between the Rothschild Family and this company, some less-sophisticated members of the public may have believed that such a connection existed.

36.     In or about January 1991, this company filed for bankruptcy under Chapter 11 of the federal Bankruptcy Code, in the U.S. Bankruptcy Court for the Southern District of New York. The Rothschild Family recognized that if the assets of the bankrupt entity were sold, there was a risk that an unscrupulous person or entity would purchase the rights to the L.F. Rothschild name and exploit it in an attempt to mislead the public into suggesting that the business was connected with the Rothschild Family or one or more of the businesses controlled by the Rothschild Family.

37.     To prevent this risk of misuse of the mark, a Rothschild Family-controlled company, Arcan N.V. ("**Arcan**"), purchased all right, title and interest to the mark L.F.

- 11 -

ROTHSCHILD from the debtor, L.F. Rothschild & Co. Inc., and its parent, L.F. Rothschild

Holdings, Inc. ("**Holdings**"), pursuant to an Asset Purchase Agreement dated April 30, 1993.

Arcan paid a considerable amount of money for these rights.  L.F. Rothschild & Co. Inc. and

Holdings assigned the mark L.F. ROTHSCHILD to Arcan by a Bill of Sale dated May 4, 1993.

38.    The rights to the L.F. ROTHSCHILD mark have since been assigned from Arcan

to NC Investments N.V., another Rothschild Family-controlled company.

**Kaplan & Co. And Kaplan's Involvement In Market Timing And Late Trading
Schemes That Violated Federal And State Law, And SEC Sanctions Imposed Upon
Them**

39.    Based upon the December 18, 2006 Order of the SEC referred to below, it appears

that Kaplan & Co. was registered with the SEC as a broker-dealer on September 15, 1995, and as

an investment adviser on March 21, 2003.  Upon information and belief, at relevant times,

Kaplan & Co./LF Rothschild has conducted operations at 150 East Palmetto Park Road, Boca

Raton, FL 33432.  This entity appears also to have had a New York branch located at 10 East

40th Street, New York, NY 10016.

40.    I have recently reviewed www.lfrothschild.com, the website operated by the

Kaplan Defendants ("**Website**"), which describes the business of the entity formerly called

Kaplan & Co. Securities and which is now called L.F. Rothschild, LLC.   The Website states that

it solicits and provides broker-dealer and investment advisory services to both institutional and

individual clients.  RINC is also a registered broker-dealer and NASD member.  RAM is a

registered investment adviser servicing institutions and high net worth individuals; Kaplan &

Co./LF Rothschild also appears to service the same market.  According to the December 18,

2006 SEC Order, Kaplan is, and has been since September 15, 1995, the chief executive officer

and control person of Kaplan & Co.  He appears to have maintained this role with LF Rothschild,

- 12 -

as shown by his listing on the Website (Exhibit 1) and the NASD website, which shows him to be CEO of the entity with an ownership percentage of 75% or more. (Exhibit 2).

41.    The Website, the NASD website, and all other available sources of information on Kaplan & Co./LF Rothschild that I have seen do not indicate that anyone named "L.F. Rothschild" or "Rothschild" is or has been associated with any of the Kaplan Defendants at any relevant time.

42.    One of the most serious scandals in the securities business in recent years was the "late trading" and "market timing" schemes uncovered and prosecuted by Eliot Spitzer, the then-Attorney General of the State of New York, and by the SEC. "Late trading" refers to a scheme by which broker-dealers executed favored customers' mutual fund trades after 4:00 pm Eastern Time, when the stock markets are closed, which allowed customers to receive same-day net asset value ("**NAV**") pricing on trades as though they were received before the close of the stock markets. Since many important news events and market changes are released or occur after the close of the stock markets, this allowed these customers to profit from these events and changes in violation of SEC regulations. Any trades in mutual funds occurring after 4:00 p.m. ET must be executed at the following day's NAV.

43.    "Market timing," generally speaking, involves the rapid trading in and out of mutual funds in order to take advantage of potentially stale stock prices. Although most mutual funds calculate the per share price of their assets at 4:00 pm ET, that price may not reflect the most up to date market information. Accordingly, mutual funds impose restrictions on shareholders who violate the fund's rules concerning excessive trading of shares. As a result of the Spitzer and SEC investigations, certain broker-dealers were found to have illegally aided certain customers to avoid these restrictions and to continue to engage in market timing, by

- 13 -

allowing them to establish multiple brokerage accounts, using multiple registered representative numbers, multiple branch codes as the originating branches of transactions, and by establishing multiple relationships with clearing firms.

44.     On January 11, 2005, the SEC entered an Order (Exhibit 3) against two employees of Kaplan & Co., Lawrence S. Powell ("**Powell**") and Delano N. Sta.Ana ("**Sta.Ana**").  The Order found that from 2000 through September 2003, while these individuals were heading the institutional mutual fund group of Kaplan & Co., they "engaged in a course of business that operated as a fraud and deceit in connection with the market timing and late trading of mutual fund shares on behalf of institutional customers."  Powell and Sta.Ana were individually required to pay disgorgement of $255,000, a civil penalty of $120,000, and were barred from further association with any broker, dealer, or investment adviser.

45.     In addition, on January 11, 2005, the same individuals pled guilty in New York State Supreme Court to a violation of the Martin Act, N.Y. General Bus. Law § 352-c(E), a Class E felony, punishable by a maximum term of one to four years imprisonment.

46.     The SEC issued a press release announcing the Order (Exhibit 4) and the New York Attorney General's Office issued a press release announcing the Powell's and Sta.Ana's guilty pleas.  (Exhibit 5).  News stories were printed in the general and financial press about the violations of the Kaplan & Co. employees and the penalties imposed upon them.  The name of Kaplan & Co. was prominently featured in these stories.  A representative sample of these stories is shown as Exhibit 6.

47.     On December 18, 2006, the SEC entered an Order against Kaplan and Kaplan & Co.  This Order (Exhibit 7) determined that Kaplan & Co., in violation of the federal securities laws and regulations issued thereunder, failed reasonably to supervise Powell and Sta.Ana, failed

- 14 -

to adopt policies and procedures to monitor market timing and late trading so as to prevent and detect their fraudulent conduct, and failed to have a system in place to implement the limited policies and procedures that did exist.

48.     The Order further determined that Kaplan, as Kaplan & Co.'s principal, in violation of the federal securities laws and regulations issued thereunder, failed to supervise Powell and Sta.Ana, delegated supervisory responsibility to Powell, but did not instruct him on how to fulfill those responsibilities or on compliance or supervisory procedures, failed to train him on how to detect or avoid trading abuses, and did not follow up on his delegation of these responsibilities. The Order further determined that Kaplan did not develop adequate policies and procedures and failed to develop existing policies and procedures to monitor Powell's and Sta.Ana's activities. It further determined that Kaplan was aware of matters warranting inquiry, such as numerous mutual fund trading orders rejected by mutual funds and mutual fund trades entered after 4:00 p.m., and failed to follow up and investigate these "red flags." It also determined that Kaplan & Co. willfully failed to maintain adequate books and records, and that Kaplan himself willfully aided and abetted in this failure.

49.     The Order further determined that "Kaplan profited from Powell and Sta.Ana's fraudulent late trading and market timing."

50.     The Order imposed, among other sanctions, censure on both Kaplan & Co. and Kaplan, a nine-month suspension of Kaplan's association in a supervisory capacity with any broker, dealer, or investment adviser, an order directing Kaplan & Co. and Kaplan to make disgorgement and pay interest in the total amount of $50,000, a civil money penalty of $50,000 on Kaplan & Co., and a civil money penalty of $50,000 on Kaplan personally.

51.     On or about December 18, 2006, the SEC issued a news summary setting forth the substance of the Order. (Exhibit 8). As a result, the news that both Kaplan & Co. and Kaplan had had disgorgement remedies and penalties imposed by the SEC, and that Kaplan had been suspended from supervisory association with securities firms, was widely reported in the general and financial press, as the attached articles show. (Exhibit 9).

**Adoption By The Kaplan Defendants Of The Deceptive And Misleading LF ROTHSCHILD & CO. And LF ROTHSCHILD Marks**

52.     Given this adverse publicity that both Kaplan and Kaplan & Co. received as a result of their and their employees' violations of law and regulations, and the imposition of the sanctions described above, it is beyond question that the name "Kaplan & Co. Securities" has acquired a highly negative connotation in the eyes of the public, particularly individuals or institutions who might otherwise consider using the financial services of Kaplan & Co.

53.     Moreover, this negative association attaching to the "Kaplan" name would have threatened the very existence of Kaplan's business. In the Internet era, someone who is contemplating using a new broker-dealer or investment advisor firm will often first use the Internet to learn more about the firm. By entering the term "Kaplan & Co. Securities" into the Google search engine, just the first 20 search results returned (Exhibit 10) include links to (a) the two SEC Orders imposing sanctions and censure described above; (b) a Connecticut Department of Banking bulletin reporting fines against a banker who facilitated the Kaplan & Co. market timing scheme (Exhibit 11); (c) a cease-and-desist order from the Alabama Securities Commission directing Kaplan and Kaplan & Co. to stop acting as a broker-dealer within Alabama (Exhibit 12); (d) a law firm alert noting that Kaplan & Co. had been named in the New York Attorney General's complaint against Canary Capital Partners, LLC, as a "complicit party"

in fraudulent mutual funds trading (Exhibit 13); and (e) an article from the *South Florida Business Journal* reporting the SEC's action against Powell and Sta.Ana (Exhibit 14).  No prudent investor having read one or more of these articles would entrust his or its business to Kaplan & Co.

54.    Certainly Kaplan (and, through him, Kaplan & Co.) knew no later than January 11, 2005, when the SEC issued its Order against Powell and Sta.Ana, and they pled guilty to criminal violations of New York's Martin Act that the reputation of the "Kaplan & Co. Securities" name was already highly impaired.  Moreover, the December 2006 SEC Order against Kaplan and Kaplan & Co. notes that it was the result of an Offer of Settlement made by those parties "in anticipation of the institution of these proceedings," indicating that Kaplan would have been aware, well in advance of the date of the Order, that he and his companies would be subject to SEC proceedings and sanctions and other governmental actions which would further increase the negative connotation that the public would ascribe to the "Kaplan & Co. Securities" name.

55.    The sequence of facts indicates that once he realized these consequences, Kaplan decided to abandon the "Kaplan & Co. Securities" name and mark for his financial services business.  Instead, he adopted a new mark for his business that would both conceal its true identity and history, and suggest to potential clients an appealing, but false connection with plaintiffs and their high reputation in financial services.  To that end, Kaplan began his pursuit of a mark to which he had no right or entitlement whatsoever:  L.F. ROTHSCHILD & COMPANY.

56.    On or about May 2, 2005, Kaplan filed an intent-to-use application with the PTO to register L.F. ROTHSCHILD & COMPANY for use in International Class 36 for financial

- 17 -

services. (Exhibit 15). It appears that the PTO found this application insufficient to grant a filing date, and that it was then abandoned by Kaplan.

57.     On or about April 27, 2006, Kaplan filed another application with the PTO to register L.F. ROTHSCHILD in International Class 36 as a trademark for financial services. (Exhibit 16). The PTO's records show that Kaplan also abandoned this application. (Exhibit 17).

58.     On or about May 4, 2006, Kaplan filed an application with the PTO to register L.F. ROTHSCHILD & COMPANY in International Class 36 as a trademark for "financial services, namely, financial management and brokerage of shares or stocks or other securities." (Exhibit 18). This application was published for opposition by the PTO on or about January 9, 2007. The Rothschild Parties filed a Notice of Opposition to the registration and supporting papers with the Trademark Trial and Appeal Board ("**TTAB**") of the PTO on or about April 27, 2007. This Opposition Proceeding (Docket No. 91176966) is currently pending before the TTAB.

59.     On or about January 3, 2007, Kaplan filed papers with the Florida Secretary of State changing the name of Kaplan & Co. Securities, LLC, to LF Rothschild, LLC. (Exhibit 19).

60.     On or about February 20, 2007, Kaplan registered the domain name www.lfrothschild.com for the Website. (Exhibit 20). Sometime thereafter, he and Kaplan & Co. (by then renamed "LF Rothschild, LLC") began operating the interactive Website. Printouts of several pages of the Website, including one page identifying Kaplan as President of the company and providing biographical information about his experience in the securities industry, are attached as Exhibit 21.

- 18 -

61.     I believe that the Kaplan Defendants have advertised their business as "L.F. Rothschild & Company" or "LF Rothschild" to the public. However, documents relating to their advertising are in the possession of the Kaplan Defendants, and plaintiffs will only be able to provide them to the Court after the expedited discovery requested by our motions.

**Plaintiffs' Objections To Use By The Kaplan Defendants Of L.F. ROTHSCHILD & COMPANY.**

62.     Our counsel subscribes to a monitoring service that advises whether someone is attempting to register a trademark containing ROTHSCHILD. This service alerted our counsel to Kaplan's filing of the trademark application referenced in paragraph 56, and counsel informed us of this fact. We had our counsel send Kaplan a letter, dated July 21, 2005, certified mail, return receipt requested, objecting to any use or registration by him of that mark. This letter stated that we viewed the application, "and any proposed use of the L.F. ROTHSCHILD mark, as a clear attempt to deceive the public and unfairly trade on public recognition of the 'Rothschild' name and mark, in violation of federal and state trademark law." The letter demanded that Kaplan "immediately cease and desist from any use of the name or mark L.F. ROTHSCHILD." Although the letter was addressed to Kaplan's home address as identified in his application to register the mark, it was ultimately returned to plaintiffs' counsel by the U.S. Postal Service with an "unclaimed" stamp affixed to the envelope. (Exhibit 22).

63.     We again became aware that Kaplan was trying to register the mark L.F. ROTHSCHILD & COMPANY when that mark was published for opposition in January 2007. We filed for extensions of time in which to oppose registration, and, as noted above, commenced an opposition proceeding against registration of the mark in April 2007.

- 19 -

64.    However, we did not know that the Kaplan Defendants had actually begun use of the Infringing Marks until approximately June 12, 2007, when employees of plaintiffs first observed the Website and saw the use of those marks made by defendants on the Website. We then instructed our counsel to investigate, to prepare papers, to commence this action, and to seek preliminary relief against the Kaplan Defendants.

**The Kaplan Defendants' Use Of A Confusingly Similar Graphic Mark**

65.    The Kaplan Defendants' bad faith is further confirmed by their choice of a graphic "LF ROTHSCHILD" mark that closely resembles the Rothschild Parties' own graphic ROTHSCHILD mark.

66.    Since 2002, the Rothschild Parties have used a graphic representation of the mark ROTHSCHILD that consists of the name "ROTHSCHILD" in a capital letter font, to the immediate left of which is the capital letter "R" in a different font and in a square, and to the further left of which is a "Five Arrows" graphic device, also in a square. This graphic mark now appears on the www.rothschild.com website operated by the Rothschild Parties, on their letterheads, and in their printed materials. (Exhibit 23).

67.    On the home page and most other pages of the Kaplan Defendants' Website, there is a frame that consists of a graphic representation of the mark LF ROTHSCHILD which is the same on every page, and text and graphics that vary depending on the page that the user clicks on. (Examples of these pages are attached at Exhibit 21). The graphic representation of the mark LF ROTHSCHILD appears in two parts: the name "Rothschild," represented in a capital letter font very similar to that used by the Rothschild Parties in their graphic ROTHSCHILD mark, and the letters "LF," which appear in a square immediately to the left of the name "Rothschild," just as the letter "R" appears in a square next to the name "Rothschild" in the

- 20 -

Rothschild Parties' ROTHSCHILD mark. A comparison of the uses of these marks by the Rothschild Parties and the Kaplan Defendants is attached as Exhibit 24.

68.    This choice of graphics which so closely mimic the Rothschild Parties' own graphics was no coincidence. It is additional evidence that Kaplan selected the Infringing Marks and designed this graphic mark in order to falsely suggest to potential customers that his business was connected to the plaintiffs and the Rothschild Family, and thereby misappropriate the reputation for reliability and integrity that our businesses have so carefully developed.

**The Kaplan Defendants' Wrongful Use Of L.F. ROTHSCHILD & COMPANY And LF ROTHSCHILD Threatens Plaintiffs With Irreparable Harm**

69.    Unless this Court issues an order enjoining the Kaplan Defendants from further use of the Infringing Marks until the trial of this action, the Rothschild Parties are likely to suffer serious and irreparable injury.

70.    First, as discussed above, we have invested many years and much time and money to promote and protect our marks. The mark ROTHSCHILD is one of the most valuable in the world and has been continuously used by the Rothschild Family for over 200 years. It is regarded by the public as being synonymous with banking and finance businesses controlled by the Rothschild Family. In the United States, we have constantly striven to expand the prestige of this mark and our "family of marks" using ROTHSCHILD, such as ROTHSCHILD NORTH AMERICA, ROTHSCHILD INC., and ROTHSCHILD ASSET MANAGEMENT.

71.    Trust is particularly important in the financial industry because investors only want to do business with entities they believe have integrity. If the public associates dishonesty or disrepute with a financial advisor or investor, the consequences will be devastating for that business.

- 21 -

72.    A financial services business that uses "Rothschild" in its name suggests to the public that it is connected with plaintiffs and, beyond them, the Rothschild Family. It thereby acquires immediate credibility and appeal to investors.

73.    If the Kaplan Defendants are permitted to continue to use the Infringing Marks, there is no question that many of the potential consumers of broker-dealer and investment advisor services exposed to those marks will believe that we stand behind the business using those marks. This is particularly dangerous given the fact that Kaplan and Kaplan & Co. have recently been found to have violated the securities laws and regulations under which our own businesses operate and that Kaplan was also found to be in violation of Alabama securities laws. (Exhibit 12). There is significant risk that Kaplan and/or Kaplan & Co./LF Rothschild will again violate the law and that our reputation will be damaged by those violations. No amount of money will be able to repair the damage to our reputation.

74.    In addition, many of the existing customers of Kaplan & Co. at the time the business changed its name may now believe or be under the misimpression that the business was bought by or became affiliated with one of our companies. This is also likely to occur with people who do research on Kaplan & Co. and discover that it has changed its name to "LF Rothschild." For those who know or learn about the SEC Order against Kaplan and Kaplan & Co., this will lead them to believe that we have chosen to associate ourselves with a business that violated securities laws and regulations. This will greatly harm the high reputation and prestige of our distinctive marks, again in a way that money damages could not possibly repair.

75.    The likelihood that the public will be confused into believing that we are involved with the Kaplan Defendants will be increased by the fact that it and RINC are both broker-dealers registered with the SEC and are members of the NASD, the fact that it and RAM are both

- 22 -

investment advisors registered with the SEC and advise institutional and individual clients, and the deliberate selection by the Kaplan Defendants of a graphic mark that looks very much like our own ROTHSCHILD mark.

### The Court Should Order Expedited Discovery

76.     While the facts set forth above present an already compelling case for preliminary relief, the plaintiffs have an urgent need for expedited discovery from the Kaplan Defendants so that the Rothschild Parties can fully present their case at a preliminary injunction hearing.  The facts set forth in this affidavit represent what we have been able to learn about the Kaplan Defendants' use of the Infringing Marks from the Internet and government records.  However, important facts, including documents showing the full extent of the Kaplan Defendants' use of those marks, and thus the impact that such use may have on the public, are solely in their possession.  Such discovery need not be time consuming:  the relevant documents will presumably be held by the Kaplan Defendants; Kaplan and perhaps one or two of the employees of Kaplan & Co. are the only likely deponents; and significant third-party discovery will probably not be necessary.  Plaintiffs therefore request that the Court grant plaintiffs the right to take prompt, expedited discovery.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 10, 2007

JOHN M. CARROLL