# EXHIBIT 13

# Wiggin & Dana

Wiggin & Dana
Counsellors at Law

One Century Tower
P.O. Box 1832
New Haven, Connecticut
06103-3402
Telephone 203.498.4400
Telefax 203.782.2889

Offices in:
New Haven, CT
Stamford, CT
Hartford, CT
Philadelphia, PA
Cherry Hill, NJ

September 18, 2003

## As Fraud Investigations of Hedge Funds and Mutual Funds Proceed, Expect More Subpoenas, Lawsuits, and Proposals for Restrictions

On September 3, 2003, the Office of the New York State Attorney General Eliot Spitzer announced a $40 million settlement with Canary Capital Partners, LLC (a multi-million dollar hedge fund), Canary Investment Management, LLC, Canary Capital Partners, Ltd, and the managing principal Edward Stern, for fraudulent trading of mutual-fund shares. Because of suggestions that such schemes are widespread, the news has triggered a flurry of media attention, and, more notably, significant regulatory inquiries and private class actions.

The media and regulatory buzz is not unlike attention to Spitzer's investigation of Wall Street research. That 2001 investigation led to sweeping industry-wide reform with ten Wall Street securities firms agreeing to pay $1.4 billion in fines in April 2002. The 2003 mutual-fund fraud investigations and lawsuits mark the beginning of yet another chapter in the ongoing scrutiny of investment practices.

**The Canary Settlement and Complaint**

In a complaint filed in New York state court against the Canary defendants, Spitzer described two fraudulent mutual-fund trading schemes between 1999 and 2003, so-called "late trading" and "market timing."

### *Late Trading*

Unlike stocks, mutual funds are valued only once a day at the close of trading, 4:00 p.m. E.T. An investor purchases shares at the net asset value ("NAV") of the fund at the close of the day's trading. Under the rules promulgated under the Investment Company Act, orders placed after 4:00 p.m. must be processed at the following day's NAV. This requirement is known as "forward pricing."

"Late trading" occurs when a purchaser places a post-closing order and buys at that day's NAV, unlawfully receiving a benefit that other investors are denied. Spitzer described the advantage as betting on a horse race after the race. The late trader takes advantage of any post-

www.wiggin.com                    Client Alert

2

market closing news, which is not be reflected in the NAV until the following day.

### Market Timing

"Market timing," or more simply, "timing," likewise allows an investor to take advantage of market news. Unlike late trading, market timing is not illegal but is publicly disfavored, and mutual fund companies disclose to customers that they guard against such practices. The most common example of timing involves trades of funds that hold international stocks. Since some international markets close much earlier than the U.S. market, those foreign stock prices, which will affect the fund's NAV, may grow stale. A market timer would attempt to take advantage of such stale NAVs, hoping to capture a move in the market reflected in the following day's trading. Some funds state in their prospectuses that they prohibit timing trades. Others also have "timing police," who target and seek to prevent such trades.

### The Allegations

Despite the illegality of late trading and assurances by mutual funds that they do not allow timing, Spitzer alleged that Canary successfully, and with the consent of several prominent funds, engaged in both practices.

Although not naming them as defendants, the complaint identified several large mutual-fund families as participants in those schemes, specifically Bank of America Capital Management's "Nations Funds" family, Bank One Investment Advisors' s "One Group" family, Janus Capital Corporation's Janus family, and Strong Capital Management's Strong family. Allegedly, these funds agreed to allow late trading and timing in exchange for assets committed longer-term to family funds, so called "sticky assets." Since fund managers are compensated according to total assets under management, they stand to gain from such sticky asset commitments, regardless of whether fund investors are harmed by late or timed trades. Spitzer's complaint is particularly detailed as against Bank of America, describing e-mails between Canary and the mutual fund that document agreements for late trade or timing privileges in exchange for sticky assets.

The complaint also identified complicit securities firms, including Kaplan & Co. Securities, Inc., a Florida broker dealer, and Security Trust Company, an Arizona corporate trust services company that provides trading platforms.

3

### Who's Harmed?

The harm from these practices is difficult to quantify (an issue that may present itself in lawsuits against alleged perpetrators of late trading or timing schemes). In theory, investors are harmed because late traders and market timers take a share of profits that would otherwise be preserved for long-term investors. Harm may also result from increased volatility or transaction fees. Regulators have suggested that losses are in the billions.

### The Settlement

Although not admitting any unlawful trades or wrongdoing, the Canary defendants agreed to pay $30 million in restitution and a $10 million penalty. The hedge fund and its officers also consented to future cooperation in Spitzer's ongoing investigation of mutual funds.

### Ongoing Investigation by Spitzer & Others

In addition to investigating the mutual funds, since the settlement Spitzer has subpoenaed other large hedge funds, as well as other mutual fund family complexes.

Since Spitzer announced his investigations, others have been quick to follow suit.

State investigators in Massachusetts have been making inquiries at Wachovia Corp.'s Prudential Securities unit in Boston to determine whether Prudential brokers allowed market timing trades of mutual-fund shares. The Securities and Exchange Commission ("SEC") is also investigating Prudential's Boston office.

Looking more broadly, the SEC plans on sending letters to mutual funds to inquire about market-timing and fund-trading practices and policies. The National Association of Securities Dealers has announced similar inquiries of small securities firms.

James Comey, the United States Attorney for the Southern District of New York, has also announced plans to investigate.

On the criminal side, Spitzer indicted a former Bank of America broker, Theodore Sihpol III, charging him with grand larceny and securities fraud. The SEC filed accompanying civil securities fraud charges against Sihpol as well. Other criminal actions are expected.

4

**Old Theme, New Focus**

Allegations about late trading and timing may be new, but the buzz words surrounding the investigations are not.

The SEC has been conducting a fact-finding mission to review hedge-fund practices since June 2002. In May 2003, in an SEC hedge-fund round table, considering a broad range of issues about how hedge funds are operated, managed, and regulated, Chairman Donaldson described the SEC concerns as "ensur[ing] investor protection and . . . focusing on issues such as . . . transparency, risk management, conflicts of interest, and fraud."

In a press release following Spitzer's announcement this month, Chairman Donaldson expressed similar sentiments: "Today's action further illustrates the importance of the SEC's ongoing review of both hedge funds and mutual funds and the SEC's upcoming recommendations regarding improvements and increased disclosure requirements for both. As we have stated in announcing our current and ongoing study of hedge funds, there is too much money at stake for us to know as little as we do about these funds, in particular, and how they operate. Concurrently, the broad participation by individual investors in mutual funds requires that we do everything possible to understand, anticipate and address areas where there is the potential for abuse and fraud."

The underlying theme is again integrity, or more precisely, the lack of it and the need to restore it. Hedge funds remain on the target list, but mutual funds, which control trillions of investors' dollars and have been praised as solid vehicles for small, long-term investors, have joined them in the hot seat.

**Civil Actions Since the Canary Settlement**

Just one day after Spitzer announced his Office's settlement with Canary, and despite prompt announcements by Bank of America and Janus that investors would be made whole if losses were confirmed, mutual-fund purchasers demanded answers and restitution in court.

Investors in both the Janus and Strong funds filed class actions in state court in Wisconsin and Colorado. Both actions allege that the mutual-fund families breached fiduciary duties owed to the class.

Federal securities class actions have been filed against all four fund families named in Spitzer's Canary complaint in various jurisdictions including the Central District of California and the Southern District of New York.

www.wiggin.com        Client Alert

5

## What's Next?

### *More Scrutiny*

As investigations and litigation continue, further scrutiny seems certain. At best, one can hope for efficient coordination and consolidation.

Some cooperation between federal and state regulators is already underway. Spitzer, United States Attorney James Comey in the Southern District of New York, and the SEC met soon after the Canary settlement. As described above, Spitzer and the SEC have already cooperated in a joint civil action against Sihpol, a former broker at Bank of America. More significantly, SEC Chairman Donaldson announced a 12-member task force initiative to recommend improvements in communication and coordination for high-profile cases.

Although civil litigation is spread out in state and federal courts throughout the nation, plaintiffs or defendants may ultimately seek consolidation as they face tricky issues of proving losses associated with late trading and timing. Those parties in the federal suits, at least, could seek to consolidate the actions for pre-trial purposes through the panel for multi-district litigation. Civil defendants in state courts may seek to remove the actions to federal jurisdictions to join in such consolidation.

### *Internal Investigations*

In their pledge to ascertain whether investors suffered losses, the mutual-fund families will likely conduct internal investigations and cooperate with regulators. Bank of America has already fired several employees allegedly connected to the Canary scheme, including Robert Gordan, who ran its mutual fund division, and Charles Bryceland, who headed the bank's brokerage and private-banking office and apparently wrote a January 2002 e-mail describing the relationship with Canary as "profitable" (yet another cautionary tale of e-mails as potent evidence of wrongdoing). Despite such efforts, the funds face significant hurdles, as Morningstar recently recommended that investors sell holdings in the four targeted firms.

### *Federal Proposals*

The newly-revealed schemes may also influence SEC proposals already underway.

For example, an existing SEC proposal, which calls for more frequent disclosures of funds' portfolios, is arguably strengthened by evidence that Canary had ready access to that information even though most

6

shareholders infrequently receive full portfolio information. By SEC rule, it is distributed to them only twice a year.

Questions about "fair-value pricing" may again become a hot topic. "Fair-value pricing" allows a fund to base its NAV not on stale closing prices of international stocks but on values calculated in light of significant market events post-closing. In 2001, the SEC asked the fund industry to adopt fair-value pricing for significant events to prevent market timers from taking advantage of stale valuations. While funds now have fair-value pricing policies, the practice has been criticized as a potentially subjective departure from objective prices, and it is unclear how frequently funds substitute fair values for closing prices.

*This Alert is provided for informational purposes only and does not constitute legal advice or by itself create an attorney-client relationship. For more information, please contact David Fein at dfein@wiggin.com, Patti Roer at proer@wiggin.com, or Joellen Valentine at jvalentine@wiggin.com.*